```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/19/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

ASHLEY MAE REID,                                     :
                                                     :
                      Plaintiff,                     :            **OPINION**
                                                     :            **& ORDER**
-v-                                                  :
                                                     :            23-CV-5280 (JLC)
                                                     :
MARTIN O'MALLEY, COMMISSIONER                        :
OF THE SOCIAL SECURITY                               :
ADMINISTRATION,                                      :
                                                     :
                      Defendant.                     :
                                                     :
----------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Ashley Mae Reid commenced this action against Kilolo Kijakazi,

then Acting Commissioner of the Social Security Administration,[1] seeking review of

the Commissioner's denial of Supplemental Security Income ("SSI") under Title XVI

of the Social Security Act.  Reid has moved for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth

below, Reid's motion is denied.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley,
the Commissioner of the Social Security Administration, is hereby substituted for
Kijakazi.

## I. BACKGROUND

### A. Procedural History

On January 24, 2020, Reid filed an application for SSI, alleging a disability onset date ("DOD") of October 1, 2008.  Administrative Record ("AR") at 10, Dkt. No. 12.[2]  The Social Security Administration ("SSA") denied this claim first on August 18, 2020, and then again upon reconsideration on April 7, 2021.  *Id*.

Reid then requested a hearing before an Administrative Law Judge ("ALJ"), which was received on May 26, 2021.  *Id*.  On March 14, 2022, represented by counsel, Reid attended and testified at a hearing before ALJ Kieran McCormack.  AR at 29–60.  The hearing took place by videoconference due to the extraordinary circumstances presented by the COVID-19 pandemic.  *Id*. at 10, 31.  In a decision dated March 28, 2022, the ALJ denied Reid's claims, finding her to be not disabled from the period of January 24, 2020 through the date of the decision.  *Id*. at 10.  The Appeals Council denied review on April 20, 2023.  Dkt. No. 1-1, at 1.

Reid timely commenced this action on June 22, 2023, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Complaint ("Compl."), Dkt. No. 1.  On June 28, 2023, the parties consented to my jurisdiction.  Dkt. No. 11.  On August 28, 2023, the Commissioner answered Reid's

---

[2] Unless otherwise specified, the page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.  Additionally, the AR spans multiple ECF filings but, since the pagination is continuous, the Court will refer to the bottom right pagination and include the corresponding docket number as appropriate.

complaint by filing the administrative record.  Dkt. No. 12.  On October 30, 2023,

Reid moved for judgment on the pleadings and submitted a memorandum of law in

support of the motion.  Notice of Motion, Dkt. No. 17; Memorandum of Law in

Support of Plaintiff's Motion ("Pl. Mem."), Dkt. No. 16.  The Commissioner then

filed a brief opposing Reid's motion on November 22, 2023.  Commissioner's Brief in

Opposition to Plaintiff's Request for Review ("Def. Mem."), Dkt. No. 18.  Plaintiff did

not submit any reply papers.  *See* Dkt. No. 19.

### B. The Administrative Record

#### 1. Reid's Background

Reid was born on May 31, 2000.  AR at 22.  At the time of the hearing, Reid

lived in Walden, New York with her mother, after previously living in Virginia with

her grandparents and father.[3]  *Id*. at 34.  Reid completed high school with an

Individualized Education Program ("IEP") and received her high school diploma in

May 2019.  *Id*. at 12, 249.

Reid claims that she suffers from mental ailments that render her unable to

work.  *Id*. at 48.  She testified that she was diagnosed with major depressive

disorder, attention deficit hyperactivity disorder ("ADHD"), and generalized anxiety

disorder.  *Id*. at 41.  She also suffers from short-term memory loss, is unable to

socialize, and can only leave the house to eat or shop if accompanied.  *Id*. at 42–43.

---

[3] While the transcript states that Reid lived in "Waldon" at the time of the hearing, the Court believes this was a typographical error as the zip code corresponds to Walden, New York.

Reid claimed in an Adult Disability Report that she suffered from the following medical conditions: depression, anxiety, ADHD, limited reading ability, and limited writing ability. *Id.* at 206.[4]  At the time she filed the disability report, Reid also reported taking Zoloft (sertraline), an antidepressant. *Id.* at 46.

### 2. Relevant Medical Evidence

In her motion papers, Reid has provided a summary of the medical evidence contained in the administrative record. *See* Pl. Mem. at 6–10.  The Commissioner has also provided a summary of the same. *See* Def. Mem. at 2–7.  Having examined the record, the Court adopts the parties' summaries as accurate and complete for purposes of the issues raised in this action. *See, e.g., Thomas v. Saul*, No. 19-CV-6990 (MKV) (RWL), 2020 WL 5754672, at *1 (S.D.N.Y. July 24, 2020) (adopting parties' medical opinion summaries), *adopted sub nom. Thomas v. Comm'r of Soc. Sec.*, 2020 WL 4731421 (Aug. 14, 2020).

The Court will discuss the medical evidence pertinent to the adjudication of this case below in section II.B.

### 3. ALJ Hearing

As noted, the hearing was held before ALJ McCormack on March 14, 2022. AR at 31.  When asked by the ALJ about her mental impairments that prevented her from working, Reid confirmed that she has had major depressive disorder, ADHD, and generalized anxiety disorder for 13 years. *Id.* at 41.  She also testified she has short-term memory issues and is unable to socialize. *Id.* at 42.  When the

---

[4] The Adult Disability Report is not dated.

ALJ asked what caused an increase in her symptoms, she responded, "[j]ust being around people and stuff." *Id.* at 43. She told the ALJ she spends her typical day "watch[ing] [her] phone until [she] get[s] hungry, and then [she'll] make something in the microwave," and is then on her phone and goes back to sleep until her mother gets home, at which point she "just hang[s] out with [her] the rest of the day." *Id.* at 45. Reid further testified that she is unable to make change if given money, has missed a doctor's appointment due to her memory issues, and has trouble sleeping at night. *Id.* at 47. When asked why Reid believed she could not work, she stated:

> I just get so scared talking to people, and I don't know. It's like – I just get nervous, and I could pass out sometimes. It depends on what situation it is, but mostly all the time I will get nervous, and I'll just be afraid that I'll like mess up.

*Id.* at 48.

Reid's mother testified as a witness to her daughter's alleged inability to work. *Id.* at 50–54. She explained that "[t]here's always somebody with her"—be it her, her brother, or Reid's boyfriend—and that Reid has not gone into a store by herself since moving to New York from Virginia. *Id.* at 51. She further testified that her daughter "would be a danger to herself and the people around her" as Reid once passed out because she got "nervous and scared" when asked to put detergent in machines at the laundromat her mother managed, *id.* at 50–52, and, on another occasion, was unable to refill the pre-cut lettuce and tomatoes at the Mobil gas station deli her mother worked at when asked to do so. According to Reid's mother,

she "[was] just still standing there looking at me, because she's like I don't know what to do." *Id.* at 53.

The ALJ then posed a series of hypotheticals to Vocational Expert ("VE") Peter Manzi, who also testified at the hearing. *Id.* at 55–59. As Reid has a high school diploma, with no past relevant work, the ALJ first presented the VE with a hypothetical of an individual with a high school diploma who

> can perform the full range of work at all exertion levels, except that the individual can only work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving simple work-related decisions with few, if any, workplace changes, and where there is – pardon me – involving simple work-related decisions with no more than occasional workplace changes. . . . In addition, and where there's only occasional interaction with supervisors, co-workers, and/or the general public.

*Id.* at 55. When the ALJ asked if there were any jobs in the national economy such an individual could perform, the VE replied that an individual could work as "a garment folder,"[5] "a bagger,"[6] and a "photocopy-machine operator."[7] *Id.* at 57.

---

[5] A garment folder "[f]olds garments for bagging or boxing, following guide marks on table or using folding board (cardboard or metal form). Secures folds with metal clips. May include tissue paper between folds. May make final inspection of garment. May pack garments in bags and boxes." EMP. & TRAINING ADMIN., U.S. EMP. SERV., U.S. DEP'T OF LABOR, 2 DICTIONARY OF OCCUPATIONAL TITLES 838 (1991) ("DOT").

[6] A bagger "[c]overs garments or household articles with plastic or paper bags" by hanging items on a stand and "sliding plastic material" over the item to cover it or using heating irons or other automatic machines to cover items. DOT at 936.

[7] A photocopying-machine operator "[t]ends duplicating machine[s] to reproduce handwritten or typewritten matter" and "[may] clean and repair machine." DOT at 177.

The ALJ next posed a second hypothetical regarding an individual with the same limitations as the first hypothetical, except

> [t]he individual can only work at jobs allowing the individual to be off task by at least 20% of the day during the course of an eight-hour day.  In addition, the individual can only work at jobs where the individual will be allowed to have four absences from work each month.

*Id*. at 58.  The VE replied that "each of those limitations would rule out work."  *Id*.

The ALJ then completed his questioning of the VE and provided Reid's counsel the opportunity to pose hypotheticals to the VE, which Reid's counsel declined to do.  *Id*.

### 4. The ALJ's Decision

The ALJ denied Reid's application in a 14-page decision on March 28, 2022. *Id*. at 10–23.  In the decision, he concluded that Reid was not disabled under section 1614(a)(3)(A) of the Social Security Act from January 24, 2020, through the date of the decision.  *Id*. at 10.

Following the five-step test set forth in the SSA regulations, the ALJ first determined that Reid had "not engaged in substantial gainful activity" since January 24, 2020, the date of her application for benefits.  *Id*. at 12.

At the second step, the ALJ determined that Reid has the following severe impairments: "major depressive disorder (MDD), attention-deficit hyperactivity disorder (ADHD), generalized anxiety disorder (GAD), and mild intellectual disorder."  *Id*.  While the ALJ considered Reid's reading disorder (which was diagnosed in March 2009), he ultimately determined that this condition was "not a

severe impairment" because Reid achieved passing grades in high school, received a high school diploma, and her diagnoses did not indicate any "objective showing of any limitation from this impairment" as pertaining to "'paragraph B' criteria." *Id.* at 12–13.

At step three, the ALJ found that Reid's mental impairments, considered singly and in combination, did not "meet[] or medically equal[] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (30 CFR 416.925 and 416.926)." *Id.* at 13.  He also concluded that Reid's impairments, considered singly and in combination, "d[id] not meet or medically equal the criteria of Listings 12.04, 12.05, 12.06, and 12.11." *Id.*

The ALJ then determined that Reid had a "moderate limitation" in "understanding, remembering, or applying information." *Id.*  While Reid testified that she has significant memory issues, the ALJ observed that she attained "solid grades," graduated high school with an IEP, and her treatment and examination records showed only "modest difficulties in intellectual functioning and isolated observations of difficulties in memory." *Id.*

The ALJ also determined that Reid had a moderate limitation in interacting with others, as Reid regularly traveled between New York and Virginia, was assessed as cooperative and appropriate in mental health treatment and examinations, and recent treatment notes indicated improved socialization. *Id.*

The ALJ next determined that Reid had a moderate limitation concentrating or maintaining pace, finding that she was fully oriented at mental health

examinations and only exhibited isolated instances of "abnormal thought content or specific difficulties with attention and focus." *Id*.  The ALJ opined that the consultative examiner identified that deficits in concentration were due to Reid's "suboptimal effort" during the examination.  *Id*.

The ALJ further determined that Reid had a moderate limitation adopting or managing herself.  *Id*.  For example, the ALJ noted that while Reid needs the occasional reminder to complete some tasks, she "engages in [a] range of activities including art, singing, and watching movies," and demonstrates "appropriate grooming and dress."  *Id* at 14.  Moreover, the ALJ found that Reid's treatment "has been conservative and limited to medication management and counseling," and concluded that as Reid's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria (criteria of listing 12.05) are not satisfied."  *Id*.

The ALJ also determined that "paragraph C" criteria of 12.04 and 12.06 were not satisfied, because

> [t]he medical evidence of record does not establish (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's disorder and (2) marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

*Id*. at 14.

The ALJ then assessed whether Reid's diagnosis of a mild intellectual disorder and her IQ scores satisfied Listing 12.05 and its requirements under either

paragraph A or B.  *Id*.  As the record did not establish that Reid was unable to participate in standardized testing or that she exhibited "the required deficits in adaptive functioning," the ALJ concluded the requirements of paragraph A were not met.  *Id*. at 15.  Similarly, he concluded the requirements of paragraph B were not met because "the record establishes no more than moderate limitations in the functional areas of subparagraph 2."  *Id*.

Next, at the fourth step, the ALJ found that Reid had "the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels" with the following "nonexertional limitations":

> [Reid] can only work at low stress jobs, defined as containing no more than simple, routine, and repetitive tasks involving only simple, work-related decisions; with no more than occasional workplace changes; and where there is only occasional interaction with coworkers, supervisors, and/or the general public.

*Id*.

In determining Reid's RFC, the ALJ "considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "medical opinion[s] and prior administrative medical finding[s]."  *Id*. at 16.  The ALJ determined that Reid had an "underlying medically determinable physical or mental impairment(s)" which "could reasonably be expected to produce the claimant's pain or other symptoms."  *Id*.  However, the ALJ also concluded that "the intensity, persistence and limiting effects of the claimant's symptoms [were] not shown by the medical evidence and other evidence in the record to be disabling under SSA law."  *Id*.

In evaluating Reid's treatment records, the ALJ discussed a number of medical opinions, finding that objective medical evidence demonstrated that Reid is "able to perform work in a low stress environment." *Id*. at 16–17.  The ALJ first considered psychologist Dr. Alex Gindes' intellectual evaluation of Reid in March 2009 when Reid was eight years old.  *Id*. at 17.  He noted that while Dr. Gindes concluded that Reid functioned at the high end of mild intellectual deficits, the ALJ determined that, given Reid's educational record of graduating high school with an IEP and receiving average to below average grades, Reid's "history of academic difficulties d[id] not direct a finding of profound intellectual and cognitive deficits" that would preclude her from "perform[ing] simple and routine work."  *Id*.

The ALJ then considered Reid's mental health records from Jonci Berneche, LPC, from 2017 through 2019, prior to the January 2020 filing date.  *Id*.  Though Berneche described Reid as "observ[ing] a depression and anxious mood and some impairment of recent memory," she noted that Reid "remained fully oriented with normal perception, thought form, and thought content."  *Id*.  The ALJ opined that subsequent mental health records demonstrated "stable cognitive functioning."  *Id*.

Next, the ALJ considered Reid's mental health records from Dr. Lorraine Allegro-Skinner, in which Dr. Allegro-Skinner determined during a psychiatric evaluation that Reid "was cooperative with appropriate mood, affect, and thought." *Id*.  The ALJ found that even though Reid had lapsed in taking her medication at the time, her "psychiatric condition was stable."  *Id*. at 18.

The ALJ also considered the August 2020 psychiatric evaluation conducted by Dr. Todd Deneen, Psy. D.  Dr. Deneen reviewed Reid's mental health history, which included "dysphoric mood, nervousness around groups of people, anxiety around males, and panic attacks with palpitations and trembling."  *Id.*  He also noted that while Reid had an "immature demeanor," her dress and hygiene were "adequate" and she demonstrated "fair" social skills.  *Id.*  Moreover, while Dr. Deneen noted that Reid had "impairments in attention, concentration, and memory," he concluded that this was "due to suboptimal effort."  *Id.* at 18.  The ALJ thus concluded that Dr. Deneen's "observation of impairments in attention, concentration, and memory do not direct a finding of significant difficulties in these functional areas."  *Id.*  The ALJ then discussed Dr. Deneen's observation that Reid engaged in "enjoyable activities" such as "drawing, using her phone, and watching television," as well as Reid's ability to regularly perform tasks around the home such as showering, cleaning, and dressing.  *Id.*  Dr. Deneen also noted that, according to Reid's mother, she helped Reid with cooking, shopping, and cleaning as Reid "has not performed these activities by herself."  *Id.*  In considering Dr. Deneen's evaluation, the ALJ noted that "Dr. Deneen did not suggest that cognitive barriers, as opposed to mere inexperience, precluded [Reid] from performing these tasks."  According to the ALJ, given Reid's "suboptimal effort on cognitive tasks, Dr. Deneen's report does not support an assessment of additional functional limitations."  *Id.*

The ALJ then considered Reid's mental health examination by Mildred Riley-Channer, LMSW, in September 2020, and Dr. Shahana Ayub's October 2020 psychiatric examination.  He noted that Riley-Channer assessed Reid with "poverty of content," "mild impairment of judgment," and "abnormal thought content with the claimant's history of learning difficulties," but considered her conclusion that Reid "had no perceptual impairment and did not present as a risk of harm."  *Id.*  He also took note of Dr. Ayub's determination that Reid's "basic cognitive functioning including thought process, perception, associations, concentration, and memory were intact."  *Id.*  The ALJ then concluded that Riley-Channer and Dr. Ayub's assessments of Reid, while "describ[ing] mental health issues requiring treatment," were "conservative" in that they recommended only "counseling and medication management."  *Id.*

The ALJ further observed that although Riley-Channer described Reid as having "substantial mental functional limitations," documents from Cornerstone Family Healthcare (where Riley-Channer practices) show that Reid's "intellect was reported as ranging from average to below average and that her memory, concentration, orientation, thought process, thought content, speech, perceptions, association, and appearance were all otherwise normal."  *Id.* at 20.  He similarly found her opinions to be inconsistent with records from Hope For Tomorrow, which demonstrated that Reid's memory was impaired during her initial examination on August 24, 2017, but her speech, thought content, orientation, content and judgment were all found to be normal during examinations from 2017 to 2019.  *Id.*

at 20–21.  The ALJ thus found that Riley-Channer's opinions were "inconsistent with the preponderance of the other objective psychiatric evidence of record."  *Id.*

Next, the ALJ considered follow up treatment notes and acknowledged that while the "notes suggest some ongoing complaints of mood difficulties and anxiety," they also "suggest some improvement in [Reid's] mood and socialization."  *Id.* at 19. In Dr. Ayub's July 2021 follow up treatment notes, for example, Reid reported that she had ceased taking her medication "because she wanted to know whether she could function without [it]."  *Id.*  The ALJ noted that Reid's "stable mood, even after voluntary cessation of medication without the direction of Dr. Ayub, [was] not consistent with her allegations of debilitating mood and anxiety symptoms," demonstrating that Reid "can sustain the mental demands of simple work with reduced social interaction in a low-stress environment."  *Id.*

The ALJ then considered prior administrative medical findings and medical opinion statements.  He found persuasive the Disability Determination Service's [("DDS")] prior administrative findings of Reid's mental residual functional capacity, and specifically the examiners' findings that Reid "can understand and remember simple instructions and procedures; carry out simple tasks and sustain a routine; interact appropriately with coworkers and peers despite some difficulty in a public setting; and adapt in a work-appropriate manner."  *Id.* at 21.

By contrast, the ALJ found unpersuasive Dr. Deneen's opinion that Reid had mild limitations in understanding and remembering simple instructions, and moderate limitations in understanding and remembering complex instructions.  *Id.*

14

at 19.  In Dr. Deneen's medical source statement, he stated that Reid could not manage her own money; however, the ALJ gave weight to Dr. Deneen's observation that Reid's "effort was deliberately suboptimal during an examination of [Reid's] attention, concentration, and memory," which the ALJ found consistent with the DDS examiner's report and "other evidence in the file." *Id*. at 19–20.  The ALJ also noted that Dr. Deneen opined that Reid had "no limitation in using reason and judgment to make work related decisions; interacting appropriately with coworkers, supervisors, and the public." *Id*. at 19.  Dr. Deneen further found that Reid exhibited

> mild limitations in understanding, remembering, or applying simple directions and instructions; regulating emotions, controlling behavior, and maintaining well-being; and a moderate limitation in understanding, remembering, or applying complex directions and instructions and sustaining concentration and performing a task at a consistent pace.

*Id*.  The ALJ thus determined that Dr. Deneen's opinion regarding Reid's inability to manage her finances was inconsistent with the record as a whole.

The ALJ also found Berneche's opinions unpersuasive as they were "inconsistent with the preponderance of the evidence." *Id*. at 20.  While Reid's initial August 24, 2017 evaluation at Hope For Tomorrow (where Berneche practices), noted that "[Reid's] memory was impaired," notes from the same visit, and subsequent visits through August 29, 2019, described Reid's "speech, thought content, orientation, concentration, and judgment" as normal.  *Id*.  The ALJ found Berneche's opinions to be "inconsistent with the preponderance of the other

psychiatric evidence of record," as Riley-Channer's examination noted Reid's intellect "rang[ed] from average to below average and that her memory, concentration, orientation, thought process, thought content, speech, perceptions, association, and appearance were all otherwise normal." *Id.* Furthermore, the ALJ found Berneche's statements that Reid should receive homebound instruction and be exempted from Standards of Learning ("SOL") testing unpersuasive as "these opinions were rendered within the purview [of] school system rules and requirements pertaining to students are not binding on SSA." *Id.*

At the conclusion of step four the ALJ found that, based on all the evidence in the record, Reid had the RFC "to perform work in a low-stress environment with occasional public interaction" with the aforementioned exceptions. *Id* at 22. The ALJ opined that this conclusion was "supported by the objective medical evidence; the subjective factors applicable to this case, including the claimant's generally intact activities of daily living, her limited and conservative mental health treatment, and her significant improvement with treatment such that she intended to stop taking medication," and the DDS's prior administrative findings. *Id.*

At step five, after considering Reid's "age, education, and residual functioning capacity," the ALJ concluded that Reid could perform jobs such as garment folder, bagger, and photocopy machine operator, all of which existed in significant numbers in the national economy. *Id.* at 23. Accordingly, the ALJ concluded that Reid was not disabled prior to the date of the decision. *Id.*

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides."  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (incorporating the judicial review provided in § 405(g) for SSI).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (cleaned up)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court "must be careful not to substitute its own judgment for that of the Commissioner,

even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (cleaned up)).  "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (alteration in original) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). "[T]he ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim." *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021 WL 5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No. 15-CV-144 (WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016)); *see also Milliken v. Saul*, No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17, 2021) ("A 'closed period' of disability occurs where a claimant is found by the Commissioner to be disabled for a finite period of time which began and ended prior to the date of the agency's administrative determination of disability.").

        In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id*. (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled." *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner establishes whether the claimant is presently employed.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *See* 20 C.F.R. § 404.1520(d).

If the claimant's impairment does not meet or equal a listed impairment, then the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether

the claimant possesses the ability to perform any other work.  *See* 20 C.F.R.

§ 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See, e.g.*, *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at

111.  Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R.

§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's

impairments on the claimant's functional capacity."  *Pena v. Astrue*, No.

07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations

omitted).  Whether the ALJ has satisfied this duty to develop the record is a

threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.")).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act."  *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (quotation marks omitted) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  For Supplemental Social Security Income and Social Security Disability Insurance applications filed prior to March 27, 2017, SSA regulations set forth the "treating physician rule," which required an ALJ to give more weight to

22

the opinions of physicians with the most significant clinical relationship with the plaintiff.  20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2); *see also, e.g., Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Under the treating physician rule, an ALJ was required to give "good reasons," 20 C.F.R. § 404.1527(c)(2), if she determined that a treating physician's opinion was not entitled to "controlling weight," or at least "more weight," than the opinions of non-treating and non-examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000).  In addition, a consultative physician's opinion was generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

However, in January 2017, the SSA revised its regulations regarding the evaluation of medical opinions for claims filed on or after March 27, 2017 (such as Reid's claim in this case).  *See* Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  "In implementing new regulations, the SSA has apparently sought to move away from a perceived hierarchy of medical sources."  *Velasquez v. Kijakazi*, No. 19-CV-9303 (DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed. Reg. 5844).  The new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)).  "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors:' (1) supportability, (2) consistency,

(3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies. 20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b). Under the new regulations, the ALJ must "explain how he considered" both the supportability and consistency factors, as they are "the most important factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 160 (S.D.N.Y. 2022) ("[t]he new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight," referring to the supportability and consistency factors). Evaluating "supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021) *adopted by* 2022 WL 717612 (Mar. 10, 2022). With regard to consistency, "the new rules provide that the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)); *see generally* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion). *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "[W]hen the opinions offered by two or more medical sources about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, the ALJ [should] articulate how he considered the remaining factors in evaluating the opinions." *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021) (quotation marks removed) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)).

Courts considering the application of the new regulations have concluded that "the factors are very similar to the analysis under the old [treating physician] rule." *Velasquez*, 2021 WL 4392986, at *20 (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas*, 2021 WL 363682, at *9 (collecting cases) ("[T]he essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar."). "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was supported by well-accepted medical evidence and not inconsistent with the rest of the record before controlling weight could be assigned." *Acosta Cuevas*, 2021 WL 363682, at *9; *see also e.g., Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL

5848776, at *5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were foundation of treating physician rule).

"The failure to properly consider and apply" supportability and consistency "is grounds for remand." *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021); *see also Rosario v. Comm'r of Soc. Sec.*, No. 20-CV-7749 (SLC), 2022 WL 819910, at *8 (S.D.N.Y. Mar. 18, 2022) ("ALJ must explain in all cases how [he or she] considered" supportability and consistency); *Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *adopted by* 2021 WL 134945 (Jan. 14, 2021) (remanding so ALJ can "explicitly discuss both the supportability and consistency of the consulting examiners' opinions"). "An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d at 265). However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold

the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health & Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)).  "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.*  First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Id.* (citing 20 C.F.R. § 404.1529(a)). The kinds of evidence the ALJ must consider (in addition to objective medical evidence) include:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain

> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or other
> symptoms; 6. [a]ny measures other than treatment the
> individual uses or has used to relieve pain or other
> symptoms (*e.g.*, lying flat on his back, standing for 15 to 20
> minutes every hour, or sleeping on a board); and 7. [a]ny
> other factors concerning the individual's functional
> limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).  The ALJ need not list "each of the seven factors" in his decision, as long as it shows she evaluated claimant's credibility "by considering all of the relevant evidence."  *See, e.g., Lane v. Saul*, No. 18-CV-5523 (PGG) (OTW), 2020 WL 3965257, at *9 (S.D.N.Y. Mar. 16, 2020) (citation omitted), *adopted by* 2020 WL 1876325 (Apr. 15, 2020).

### B. Analysis

Reid appeals the ALJ's decision on two grounds: first, she argues that the ALJ erred in failing to find that her intellectual impairments meet the requirements of Listing 12.05; second, she argues that the ALJ erred in finding that Reid has the RFC to perform low stress work.  Pl. Mem. at 10–25.  The Commissioner counters that substantial evidence supports the ALJ's decision that Reid is not disabled.  Def. Mem. at 7–25.  As discussed below, the Commissioner has the better of the arguments.

1.   **The ALJ Did Not Err in Determining That Reid's Intellectual Impairments Did Not Meet or Equal Listing 12.05**

Reid argues the ALJ erred in determining that her intellectual impairments did not meet or equal Listing 12.05 because her IQ score establish[ed] "significantly subaverage general intellectual functioning" and she had extreme limitations in adaptive functioning prior to her turning 22.  Pl. Mem. at 11–12.  The Commissioner responds that Reid "is silent on much of the evidence the ALJ relied upon to find she had no more than moderate mental limitations, and instead emphasizes her own and her mother's symptom testimony[,]" and that the ALJ's Listing 12.05 analysis "was supported by the mental status findings, descriptions of Plaintiff's functioning, and opinion evidence in the record, which more than cleared" the substantial evidence threshold.  Def. Mem. at 9 (citation omitted).  For the following reasons, the Court agrees with the Commissioner.

"To satisfy Listing 12.05, the claimant must make a threshold showing that she suffers from 'significantly subaverage general intellectual functioning with deficits in adaptive functioning[,]'" and "must then demonstrate '[t]he required level of severity for this disorder' under Listing 12.05(A), (B), (C), or (D)."  *Burnette v. Colvin*, 564 F. App'x 605, 607 (2d. Cir. 2014) (first quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; then quoting *Talavera v. Astrue*, 697 F.3d 145, 152–53 (2d Cir. 2012)).  Listing 12.05(A) ("paragraph A") requires that the claimant demonstrate "significantly subaverage general intellectual functioning," as well as "deficits in adaptive functioning" that manifested before age 22.  20 C.F.R. Pt. 404, Subpt. P,

29

App. 1, § 12.05(A).[8]  To satisfy Listing 12.05(B) ("paragraph B"), the claimant must

demonstrate that prior to turning 22 she had "significantly subaverage general

intellectual functioning" as evidenced by a low IQ score, and "deficits in adaptive

functioning" based on an extreme limitation of one[] or marked limitation of two" of

the four areas of mental functioning assessed: "[u]nderstand[ing], remember[ing], or

apply[ing] information"; "[i]nteract[ing] with others";  [c]oncentrat[ing], persist[ing],

or maintain[ing] pace"; or [a]dapt[ing] or manag[ing] oneself."  *Id.* § 12.05(B);[9] *see*

---

[8] To satisfy paragraph A, the following requirements must be met:

> 1. Significantly subaverage general intellectual functioning evident in your
> cognitive inability to function at a level required to participate in
> standardized testing of intellectual functioning; and
> 2. Significant deficits in adaptive functioning currently manifested by your
> dependence upon others for personal needs (for example, toileting, eating,
> dressing, or bathing); and
> 3. The evidence about your current intellectual and adaptive functioning and
> about the history of your disorder demonstrates or supports the conclusion
> that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(A).

[9]  The full paragraph B criteria is as follows:

> 1. Significantly subaverage general intellectual functioning evidenced by a or
> b:
>> a. A full scale (or comparable) IQ score of 70 or below on an
>> individually administered standardized test of general intelligence; or
>> b. A full scale (or comparable) IQ score of 71-75 accompanied by a
>> verbal or performance IQ score (or comparable part score) of 70 or
>> below on an individually administered standardized test of general
>> intelligence; and
> 2. Significant deficits in adaptive functioning currently manifested by
> extreme limitation of one, or marked limitation of two, of the following areas
> of mental functioning:
>> a. Understand, remember, or apply information; or
>> b. Interact with others; or

*also Gainous v. Comm'r of Soc. Sec.*, No. 19-CV-10599 (BCM), 2021 WL 4847071, at

*2 (S.D.N.Y. Oct. 18, 2021) (citing same). "Factors that courts consider when

evaluating a claimant's adaptive functioning include communicating and socializing

with others, living on one's own, paying bills, caring for children, shopping, cooking,

cleaning, driving and other activities of daily life." *Randolph v. Berryhill*, No. 17-

CV-6711 (BCM), 2019 WL 1434301, at *13 (S.D.N.Y. Mar. 29, 2019) (quoting *Newell*

*v. Colvin*, No. 15-CV-7095 (PKC) (DF), 2017 WL 1200911, at *4 (S.D.N.Y. Mar. 31,

2017)). Further, courts in this Circuit have held that "under the substantial

evidence standard of review, it is not enough . . . to merely disagree with the ALJ's

weighing of the evidence or to argue that the evidence in the record *could* support

[her] position. Plaintiff must show that no reasonable fact finder could have

reached the ALJ's conclusions based on the evidence in record." *Sprague v. Comm'r*

*of Soc. Sec.*, No. 1:18-CV-666-DB, 2019 WL 4059004, at *7 (W.D.N.Y. Aug. 27, 2019)

(citing *Brault,* 683 F.3d at 448). Even if substantial evidence does support the

claimant's argument, the standard of review is "whether substantial evidence

supports *the ALJ's decision.*" *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d

Cir. 2013); *see also Biestek*, 139 S. Ct. at 1154 ("Under the substantial-evidence

standard, a court looks to an existing administrative record and asks whether it

---

            c. Concentrate, persist, or maintain pace; or
            d. Adapt or manage oneself; and
     3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(B).

contains 'sufficien[t] evidence' to support the agency's factual determinations."
(citation omitted)).

As the Commissioner observes, the ALJ disputes neither that Reid had a low
IQ score nor that Reid's intellectual disorder began before she turned 22 years old.
*See* Def. Mem. at 9–10 (citing AR at 13–14).  Rather, the ALJ found Reid not to be
disabled under Listing 12.05 because she did not show the required deficits in
adaptive functioning, as required for paragraphs A and B, nor the required
limitations in mental functioning as required in paragraph B.  AR at 13–15.
Substantial evidence supports the ALJ's determination that Reid did not satisfy the
requirements of paragraph B for the following reasons.[10]

First, Reid argues that her testimony and other evidence available in the
record demonstrates "a long-standing inability to function academically or socially
outside a highly structured setting and further proves Ms. Reid's mental
impairment meets the elements of listing 12.05."  Pl. Mem. at 13.  She further
argues that while the ALJ discussed her ability to perform certain activities of daily
living, he did not address the more expansive activities that comprise adaptive
functioning.  *Id*. at 16.  Both of these arguments, however, ignore the ways in which
the ALJ carefully evaluated the record evidence as applied to the Listing 12.05

---

[10] While Reid cites both the paragraph A and B criteria in her motion papers, her
argument appears to focus primarily on the ALJ's paragraph B analysis given her
focus on IQ.  *See* Pl. Mem. at 10–17.  To the extent that Reid also argues that the
ALJ erred by basing his determination on the paragraph B rather than paragraph
A criteria, this is unpersuasive as the ALJ considered both Reid's intellectual and
adaptive functioning as required for paragraphs A and B, as well as paragraph B's
four mental functioning categories.  *See* AR at 13–15.

criteria.  For example, in analyzing the paragraph B criteria and determining that Reid only demonstrated a moderate limitation in understanding, remembering or applying information, the ALJ considered Reid's testimony that she experiences difficulties with memory, as well as the fact that that she graduated from high school with "solid grades" notwithstanding her IEP.  AR at 13.  The ALJ further accounted for Reid's examination and treatment records from Hope For Tomorrow, Health Quest, and Cornerstone Family Healthcare, which "describe[d] only modest difficulties in intellectual functioning and isolated observations of difficulties in memory."  *Id*.  Moreover, the ALJ noted the consultative examiner's determination that Reid's difficulty in concentration and attention were due to "suboptimal effort."  *Id*.

Second, the record supports the ALJ's conclusion that Reid's limitation in interacting with others is moderate.  The ALJ discussed Reid's testimony that she "has significant difficulties in public" and cannot be home by herself, which is corroborated by "similar complaints of anxiety in the context of childhood trauma."  *Id*.  The ALJ, however, also noted that despite these reported difficulties, Reid is able to regularly travel from New York to Virginia, and regular mental health records from Hope For Tomorrow, Health Quest, and Cornerstone Family Healthcare described Reid as "cooperative and appropriate in the treatment context" and that her socialization was improving "with the support of friends and family."  *Id*.

Third, the record supports the ALJ's determination that Reid has a moderate limitation in concentrating, persisting, or maintaining pace.  *Id.*  The ALJ noted that, while Reid testified that she struggles with concentration and attention, her mental health records from Hope For Tomorrow, Health Quest, and Cornerstone Family Healthcare "indicate[d] that [Reid] is fully oriented without psychosis, hallucinations, delusions, or other serious abnormalities in thinking or perception." *Id.*  While he considered Reid's examination by the consultative examiner that "identified deficits in concentration and attention," the ALJ found the examiner's conclusion persuasive in that "those difficulties presented in the context of suboptimal effort [by Reid] on testing."  *Id.*

Fourth, the ALJ's finding that Reid has a moderate limitation in adapting or managing herself was supported by the record.  *Id.*  In his determination, the ALJ noted that Reid "engages in [a] range of activities including art, singing, and watching movies," socializes with family and friends, and although sometimes she needs reminders, "is independent in activities of personal care and consistently presents with appropriate grooming and dress."  *Id.* at 13–14.  He further noted that Reid's mental health records demonstrated that her treatment was "conservative," as it was "limited to medication management and counseling."  *Id.* at 14.  The ALJ also considered that Reid did not require partial hospitalization, intensive psychiatric treatment, "or emergency management for crisis or panic."  *Id.*

Lastly, Reid argues that the ALJ "did not address the more expansive activities that comprise adaptive functioning," Pl. Mem. at 16–17, but as the

Commissioner notes, Reid does not specify what the ALJ failed to discuss.  *See* Def. Mem. at 15.  Given that the ALJ discussed the record and testimonial evidence pertaining to Reid's personal and social functioning, her mental status findings and observations on examination, two IQ test score reports, her overall academic performance (including her graduation), and the opinion evidence, *see* AR at 13–22, there was more than sufficient evidence to support the ALJ's determination that the paragraph B criteria were not satisfied, and so the ALJ did not err on this point. *See, e.g., Devane v. Comm'r*, No. 19-CV-2134 (SDA), 2020 WL 5743520, at *6–7 (S.D.N.Y. Sept. 25, 2020) (affirming ALJ's finding of less-than-marked deficits in adaptive functioning despite diagnosis of borderline intellectual functioning and history of special education services, IQ score of 74, and claimant's mother's testimony that claimant had to repeatedly be shown how to perform simple tasks such as washing clothes using a machine); *Dijon J. v. Comm'r*, No. 20-CV-1193 (WBC), 2022 WL 446489, at *7 (W.D.N.Y. Feb. 14, 2022) (affirming ALJ's finding that claimant exhibited only moderate deficits in adaptive functioning because the ALJ balanced evidence of claimant's low IQ, special education history, personal care, and the consultative examiner's assessment of limitations that were less than marked).  Accordingly, remand is inappropriate on these grounds.

### 2.  The ALJ's RFC Determination Was Supported by Substantial Evidence

Reid contends that the ALJ did not properly consider the supportability or consistency of the medical opinions of Berneche, Riley-Channer, or Dr. Deneen in evaluating her RFC.  Pl. Mem. at 17–25.  The Commissioner counters that Reid's

arguments "largely amount to disagreement with the ALJ's factfinding, and, as such, are insufficient to warrant remand in light of the standard of review [of substantial evidence]." Def. Mem. at 1. The Court agrees with the Commissioner that substantial evidence supports the ALJ's RFC determination.

When assessing a claimant's RFC, an ALJ must consider medical opinions regarding the claimant's functioning and make a determination based on an assessment of the record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.9527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). SSA regulations require the ALJ to explicitly discuss the supportability and consistency of each medical opinion in making his RFC determination; the failure to do so constitutes legal error. *See, e.g.*, *Acosta Cuevas*, 2021 WL 363682, at *14 (regulations "require an ALJ to explain how persuasive [he] found the medical opinions [he] considered, and specifically, how well a medical source supports their own opinion(s) and how consistent a medical source/opinion is with the medical evidence as a whole"); *Velasquez*, 2021 WL 4392986, at *25 (ALJ committed legal error by, *inter alia*, failing to articulate supportability and consistency factors); *see also* 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency."). Specifically, the ALJ must "explain [his] findings regarding the supportability and consistency for each of the medical opinions [by] pointing to specific evidence in the

36

record supporting those findings." *Raymond M. v. Comm'r of Soc. Sec.*, No. 19-CV-1313 (ATB), 2021 WL 706645, at *8 (N.D.N.Y. Feb. 22, 2021) (citations and quotation marks omitted).  Notably, an ALJ does not need "to explicitly reconcile every shred of conflicting evidence, and does not have to state on the record every reason justifying a decision." *Conklin v. Kijakazi*, No. 21-CV-8486 (JLC), 2023 WL 104829, at *13 (S.D.N.Y. Jan. 5, 2023).  Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and thus the threshold of detailing such evidence is "not high." *Biestek*, 139 S. Ct. at 1154.

Reid first argues that the ALJ erred by not considering the supportability or consistency of Berneche's or Riley-Channer's medical opinions in determining Reid's RFC.  Pl. Mem. at 20.  According to Reid, Berneche's medical opinion "identified 10 signs and symptoms" exhibited by Reid that "are inconsistent with otherwise 'normal' mental status evaluations."  Pl. Mem. at 20.  The ALJ did, however, address the supportability and consistency of Berneche's opinion within the greater record.  *See* AR at 17, 20.  He considered, for example, that while Berneche "observed a depression and anxious mood and some impairment of recent memory," she also noted that Reid "remained fully oriented with normal perception, thought form, and thought content," and "retained fair concentration, insight, and judgment."  *Id.*  He also noted how subsequent treatment records from Hope For Tomorrow (Berneche's employer) "consistently describe[d] stable cognitive functioning," and treatment notes written by Berneche recorded that Reid had

traveled to New York for four days, was "better able to socialize with friends," and
"was able to maintain improved hygiene and care for personal responsibilities"
while "functioning at a level of 8 out of 10." *Id*. The ALJ further evaluated the
supportability and consistency of Berneche's opinions in noting how they were
"inconsistent with the preponderance of the other objective psychiatric evidence of
record," including, for example, that while some subsequent mental health
examinations showed "abnormal thought content," others reported Reid's intellect
"as ranging from average to below average" but "that her memory, concentration,
orientation, thought process, thought content, speech, perceptions, association, and
appearance were all otherwise normal." *Id*. at 20.

With respect to Riley-Channer, the ALJ's determination of her opinion as
unpersuasive was also supported by substantial evidence. Reid argues that Riley-
Channer's opinion was similar to Berneche's (in that Riley-Channer found that
"Reid ha[d] difficulty going into the community without support," "problems with
recall" and "keeping up with daily life skills," among other things), and the ALJ
"insufficiently analyzed the consistency factor in his evaluation." Pl. Mem. at 21
(citing AR at 707). But the ALJ properly weighed Riley-Channer's statement that
Reid "had marked difficulties in almost all functional areas," and "would be absent
more than four days per month" from a job, against other evidence in the record,
including records from Riley-Channer's employer, Cornerstone Family Healthcare,
which suggested Reid's examinations, intellect, and demeanor were "average" or
"normal." AR at 20–21. Furthermore, the ALJ's determination that Riley-

Channer's opinion was inconsistent with other psychiatric evidence in the record was supported by the treatment records of Reid's other medical providers.  *Id*.  The ALJ noted, for example, that in addition to Cornerstone Family Healthcare, Hope For Tomorrow's treatment records indicated that, while Reid demonstrated impaired memory during her initial mental status evaluation on August 24, 2017, "the remainder of that examination, as well as the remainder of all [Riley-Channer's] examinations of [Reid] through August 29, 2019, were normal."  *Id*. at 20–21.  The ALJ further considered that Reid's "speech, thought content, orientation, concentration, and judgment were all found to be normal at those mental status examinations," *id*. at 21, and in so doing, articulated the supportability and consistency of Riley-Channer's opinions in determining Reid's RFC.

Reid next argues that "the ALJ totally discounts" the opinions of Dr. Deneen, Pl. Mem. at 21, which included that Reid's demeanor was "immature" with "fair social skills," *id*. at 21 (quoting AR at 663), but this again is at odds with the ALJ's assessment of Dr. Deneen and other medical providers' opinions in the context of the record as a whole.  Reid contends that "[w]hile Dr. Deneen did find that [her] effort in his testing of her attention and concentration and recent and remote memory skills were suboptimal, this finding does not negate his other findings."  *Id*. While the ALJ expressly accounted for Dr. Deneen's report that Reid's "effort was deliberately suboptimal during an examination of [Reid's] attention, concentration, and memory,"  he did not discount Dr. Deneen's other findings.  AR at 19.  He

39

considered Dr. Deneen's articulation that Reid "ha[d] no limitation in using reason and judgment to make work-related decisions" and was capable of appropriately interacting with colleagues and the public, as well as his observation that Reid had "*mild* limitations in understanding, remembering, or applying simple directions and instructions; regulating emotions, controlling behavior, and maintaining well-being; and a *moderate* limitation in understanding, remembering, or applying complex directions and instructions and sustaining concentration and performing a task at a consistent pace." *Id*. He also considered Dr. Deneen's evaluation that Reid "has no more than moderate psychiatric limitations" and found it to be consistent with the findings of the DDS and other evidence in the record. *Id*. at 19–20. While Reid posits an alternative interpretation of Dr. Deneen's findings, as the Commissioner points out, "'if the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.'" Def. Mem. at 15 (quoting *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014)). Such is the case here as the ALJ adequately evaluated Dr. Deneen's medical opinion and discussed the supportability and consistency of the opinion within the totality of the record evidence.

Reid also argues that the ALJ "failed to consider the treating providers' opinions in light of the entire record, including [her] self-reported symptoms," and erred in his determination that her August 2017 to August 2019 mental status was "normal." Pl. Mem. at 21–24. While Reid highlights that Berneche recommended home instruction due to her inability to resist peer pressure, *see* Pl. Mem. at 6, the

ALJ balanced this evidence against other evidence in the record that she could appropriately socialize with her peers. *See, e.g.*, AR at 13–14, 283, 617, 619, 635 (noting, *inter alia*, Reid's improved socialization, ability to communicate her needs, and recommendation by mental health practitioners to take classes and play football). And as previously discussed, once an ALJ has made factual findings (such as the credibility of opinion evidence or of the claimant), those findings are entitled to deference as long as they are supported by substantial evidence. *See Osorio*, 2006 WL 1464193, at *6. Indeed, as "it cannot be said that no reasonable factfinder could have interpreted the evidence as the ALJ did" on these facts, *Brault*, 683 F.3d at 448, the Commissioner's conclusion must be upheld. *McIntyre*, 758 F.3d at 149.

In sum, substantial evidence supports the ALJ's RFC determination as he properly considered the supportability and consistency of Berneche, Riley-Channer, and Dr. Deneen's medical opinions, as well as other evidence in the record. Thus, the ALJ's determination is entitled to deference and remand is unwarranted on this ground as well.

### III. CONCLUSION

For the foregoing reasons, Reid's motion for judgment on the pleadings is denied.

The Clerk is directed to mark the motion at Docket Number 16 as denied and enter judgment for the Commissioner.

**SO ORDERED.**

Dated: April 19, 2024
     New York, New York

_____
JAMES L. COTT
United States Magistrate Judge